**District Court of the United States**
**District of Massachusetts**

FILED
IN CLERKS OFFICE

2015 NOV 9 PM 1 53

U.S. DISTRICT COURT
DISTRICT OF MASS.

------------------------------------------------

John Barth,
      Plaintiff

  vs.

City of Peabody,
RK Realty Trust, Richard Dipietro,
      Defendants

------------------------------------------------

Case No. _____

**COMPLAINT**

# CONTENTS

| | |
|---|---|
| Statement Of Claims | 4 |
| Jurisdiction | 6 |
| Fact: The Land, Prior Uses, And Conveyances | 10 |
| Fact: Denial Of The Principal Use Of Subject Property By Defendant City | 14 |
| Fact: Torts Of Defendants Prior To Denial Of The Principal Use of Subject Property | 14 |
| Summary of Fact | 23 |
| Petition For Relief | 25 |
|     Declaratory Relief: Statutes Unconstitutional As Applied | 25 |
|     Just Compensation For Taking Of Private Property | 25 |
|     Consequent Damages: Loss of Employment and Future Income | 30 |

**Summary**

This is an action to vindicate constitutional rights and obtain compensation for damages to Plaintiff caused by the defendants, by public seizure of private property in violation of rights of the Plaintiff guaranteed by the Constitution of the United States, and by numerous acts of perjury, collusion, abuse of office, trespass, vandalism, and the threat thereof.

Plaintiff has been injured financially in the use and value of his property, and the loss of extensive expense and effort toward its development, as well as in his income for several years, by the acts of defendants to prevent continuation of its rightful residential use, established in the year 1800 AD. The defendants have shown knowing disregard of constitutional rights, deliberate and persistent abuse of public office, criminal alteration of transcripts and public records, and persistent and extensive collusion, as well as crime, tort, and the threat thereof, with the intent of theft of the property of Plaintiff for the benefit of the private defendants.

Having purchased this residential property and spent thousands of hours of work and having made substantial investments in preparing for the replacement of the former home there as his home, and great effort in defending his indisputable right to do so, Plaintiff demands substantial compensation, and such punitive damages as this court may deem sufficient.

This action arises from a demand by defendant city in violation of Massachusetts G.L. Ch. 40A §6, for a zoning "variance" to replace a pre-existing home built in 1800 and demolished in 2011, on a residentially zoned lot of the Plaintiff, the decision of the city's Zoning Board of Appeals to deny such variance, and the failure of defendant city to award damages therefor as required by Massachusetts G.L. Ch. 79 and Amendments V and XIV, followed by failure of the Essex County Superior Court to award damages caused by this public taking of the principal use and value of the property without just compensation, as required by G.L. Ch. 79 §10, in violation of rights of the Plaintiff guaranteed by the Constitutions of the United States and of Massachusetts. This failure was affirmed by the Massachusetts Court of Appeals, and further appellate review was denied by its Supreme Judicial Court on 3/2/2015, whereupon state remedies were exhausted and the claims of violation of federally protected rights were mature.

The United States Supreme Court declined direct review 10/5/2015, requiring this matter to be decided in the federal district or appellate courts.

## PARTIES and Owners of Adjacent Properties

1. Plaintiff John Barth is the owner of land at 4 Lynn Street, Peabody, Essex County, Massachusetts (Peabody Assessor Map 102 Lot 255 shown in Exhibits 6-8 and 42-49), hereinafter "property of Plaintiff" or "subject property". Plaintiff is represented Pro Se.

2. Defendant City of Peabody is a municipality of Massachusetts in Essex county (pop. 52,000) having a "city" form of government (council with mayor or manager), and therefore hereinafter designated "city". The city lacked legal counsel during the period of its acts described herein.

3. Defendants Richard Dipietro and RK Realty Trust LLC (hereinafter "RK Trust", Richard and Kerry Dipietro, trustees, 6 Russet Ln, Lynnfield , MA 01940) are owners of adjacent property at 2 Lynn Street, Peabody, Massachusetts, described as Peabody Assessor Map 102 Lot 255B (property ID 102-255B), Exhibits 6-8 and 42-49, hereinafter "property at 2 Lynn Street". This is a wooden house unlawfully subdivided into four apartments, with two parking spaces where five are required by the defendant City, so that parking is inadequate.

4. The owner of the adjoining property at 6 Lynn Street (Assessor Map 102 Lot 255A, property ID 102-255A) is John Garfield, 6 Lynn St., Peabody, MA 01960.

## Jury Demand

Trial by jury is demanded for all issues of the complaint.

**Statement Of Claims**

## COUNT I

The defendant City of Peabody in collusion with defendants Dipietro and RK Trust has acted unlawfully and unconstitutionally both in requiring and denying its approval of a "variance" or "special permit" for nonconformity with its ex post facto 1954 zoning ordinance, for permission to rebuild the home erected upon property of Plaintiff about 1800AD and destroyed in 2011. Such acts threaten millions of owners of homes subject to ordinances enacted after construction, which require larger lots.

Defendant City of Peabody has taken *all or nearly all value* of residential property from the Plaintiff, by denial of permission to continue residential use thereof, and denial of all other economically viable uses thereof by its ex post facto zoning ordinance, while permitting such use to continue on all adjacent properties similarly situated, and has *denied compensation* to the Plaintiff. Defendant city has thereby acted and conspired *under color of state law* to deny to the Plaintiff the *equal protection of law*, to deny to the Plaintiff *property without due process of law*, and to *take private property without just compensation*, a deprivation of rights guaranteed by the Constitution of the United States, Art. I § 9 (*ex post facto law*), and by Amendments V and XIV, in violation of the Civil Rights Act 42 USC §§ 1981-1986; and in violation of the Massachusetts Civil Rights Act G.L. Ch. 12 § 11H et seq, and M.G.L. Ch. 265 § 37, and of the Massachusetts Constitution and Declaration of Rights, Art. 1, and Art. 106 of the Amendments, and M.G.L. Ch. 40A §6 (zoning) and Ch. 79 §§6, 10 (takings; compensation).

By these acts the defendants have also interfered with interstate commerce conducted by the Plaintiff, a resident of the state of Maine, in violation of federal law.

The said violations were by actions in *official capacities, pursuant to policy* of defendant and *by a final decision maker*, and with *intent to deprive* the Plaintiff of the said property and the free exercise of the said rights. These acts were made with full *knowledge* of the injury done, by *choice among alternatives*, and *under color of state law*, all criteria of civil rights violations.

These acts were done *without permission* of the Plaintiff, and have *caused injury* to the Plaintiff in his liberty and quality of life, the use and value of his property, and consequent damages to his income and ability to obtain future income, and costs of prosecution to obtain relief, for which Plaintiff demands full compensation. These acts are all matters of *public record*.

Although Massachusetts law (MGL) Ch. 40A §6 exempts such rebuilding of properties from zoning ordinances, and Ch. 79 §§6, 10 provides for compensation, the state courts have denied both the exemption and compensation, applying state law so as to nullify constitutional rights, and therefore the related statutes of Massachusetts are *unconstitutional as applied*.

The facts, exhibits, and argument whereof are listed and incorporated hereunder.

| | |
|---|---|
| Fact paragraphs: | Facts 1-7 (demand for variance); 8-14 (denial of variance); 15-40 (intent) |
| Exhibits: | All |
| Petition for Relief: | Paragraphs 48-68 |
| Memorandum of Law | Section A, Violations Of The Civil Rights Acts; Liability Of Municipality |
| Violations of Law: | The United States Constitution, Art. I § 9; Amendments V, XIV; Civil Rights Act 42 USC §§ 1981-1986; Constitution of Massachusetts; Mass. Civil Rights Act G.L. Ch. 12 § 11H et seq, and Ch. 265 § 37 Massachusetts Declaration of Rights, Art. 1, and Art. 106 of Amendments, |

4

MGL Ch. 40A (zoning) §§6, 10, 17; MGL Ch. 79 (takings) §§6, 7B, 10-16
M.G.L. Ch. 66 (falsification of records) §§ 5A, 6, 16; Ch. 268 §§ 6, 6A


# COUNT II

Defendants Dipietro and RK Trust, by destruction and theft of signs prohibiting trespass, by trespass upon and theft of the use of property of Plaintiff, by removal and theft of boundary markers thereupon, by threats of arson and vandalism to prevent use of the subject property by the Plaintiff; by perjury to officials of defendant city, and by conspiracy with defendant city to deny its permission to rebuild upon property of Plaintiff the long established home there,

Have acted and conspired to *take private property* of Plaintiff *under color of state law* and to deny to the Plaintiff the use and value of his property *without due process of law*, and to deny to the Plaintiff the *equal protection of law*, a deprivation of rights guaranteed by the Constitution of the United States, Art. I § 9 (*ex post facto law*), and Amendments V and XIV, in violation of the Civil Rights Act 42 USC §§ 1981-1986; and in violation of the Massachusetts Civil Rights Act G.L. Ch. 12 § 11H et seq, and M.G.L. Ch. 265 § 37, and of the Massachusetts Constitution and the Massachusetts Declaration of Rights, Art.1, and Art. 106 of the Amendments, and M.G.L Ch. 266 §§ 76, 94, 121A, and 127,

And have thereby acted to interfere with interstate commerce conducted by the Plaintiff, a resident of the state of Maine, in violation of federal law.

These acts were made with *full knowledge* of the injury done, without permission of the Plaintiff, with the intent and effect of theft of use of the subject property for themselves, and have *caused injury* to the Plaintiff in the use and value of his property, his income and ability to obtain future income, and costs of prosecution to obtain relief, for which Plaintiff demands full compensation, punitive damages, and declaratory relief against these defendants. The courts of Massachusetts have ignored the Constitution and laws of the United States in failing to grant relief to the Plaintiff, and therefore the related statutes of Massachusetts are *unconstitutional as applied*. The facts, exhibits, and argument whereof are listed hereunder.

| | |
|---|---|
| Fact paragraphs: | Facts 15-40 |
| Exhibits: | All |
| Petition for Relief: | Paragraphs 48-68 |
| Memorandum of Law | Section A, Violations Of The Civil Rights Acts; Liability Of Municipality |
| Civil Violations: | The United States Constitution, Art. I § 9; Amendments V, XIV; |
| | The Civil Rights Act 42 USC §§ 1981-1986; |
| | Mass. Civil Rights Act G.L. Ch. 12 § 11H et seq, and Ch. 265 § 37; |
| Criminal Violations: | M.G.L Ch. 266 § 76 gross fraud or cheat; |
| | M.G.L Ch. 266 § 94 removal of boundary markers |
| | M.G.L Ch. 266 § 121A trespass with motor vehicle |
| | M.G.L Ch. 266 § 127 Malicious damage to property |
| | M.G.L Ch. *** §§ *** (theft of use, threat of arson, vandalism, trespass) |

**Jurisdiction**

Jurisdiction is based upon federal issues and complete diversity. This action is brought under the United States Civil Rights Act (42 USC §§1983 to 1986), for violation by the defendants of the rights of the Plaintiff guaranteed by the Constitution of the United States, including his right against the taking of his private property without just compensation (Amendment V); his right against deprivation of property without due process of law (Amendment XIV Section 1), his right to the equal protection of the laws (Amendment XIV Section 1); and his corresponding rights under the Constitution and Laws of Massachusetts. The statutes of Massachusetts, M.G.L. Chapters 40A and 79, are unconstitutional as applied in state court to deny the Plaintiff relief from these violations of rights.

This district court has original jurisdiction under 28 USC §1331 (federal issue) of the claims herein of violations of rights guaranteed by the United States Constitution. This court also has original jurisdiction under 28 USC §1332 (diversity of citizenship) of all claims herein, as well as jurisdiction of claims of interference with interstate commerce, as Plaintiff is a citizen of the state of Maine, whereas all defendants are citizens or entities of the state of Massachusetts.

This district court has original jurisdiction under 28 USC §1343(1 and 2) (conspiracy) of the claims herein of deprivations of civil rights by acts of conspiracy in violation of 42 USC §1985 (Civil Rights Act), or failure to prevent such deprivations. This district court has original jurisdiction under 28 USC §1343(3) (color of state law) of all claims herein of deprivations of civil rights under color of state law.

With the denial of corresponding claims under state law by the courts of Massachusetts, state remedies are now exhausted and these federal claims are ripe. See Memorandum of Law, *Law of the Takings Clause*, United States Law.

## Authorities

**Cases (referenced primarily in Memorandum of Law)**
   **Definition of Constructive Taking of Property (see G.L. Chapter 79 § 10)**
101.    Palazzolo v. Rhode Island, 99-2047 (2001)
102.    Lucas v. South Carolina Coastal Council. 505 U.S. 1003
        (112 S.Ct. 2886, 120 L.Ed.2d 798) (1992)
103.    Nollan v. California Coastal Comm'n, 483 U. S. 825 (1987)
104.    Penn Central Transportation Co. v. New York City 438 U.S. 104 (1978)
105.    United States v. General Motors Corp. 323 U.S. 373, 378 (1945)
106.    Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)
107.    Old Colony & Fall River R.R. v. County of Plymouth, 14 Gray 155, 161
108.    James G. Cayon vs. City of Chicopee & another, 360 Mass. 606, 609 (1971)
109.    Gomillion v. Lightfoot 364 U.S. 339 (1960)
110.    Mesag Aselbekian & others vs. Mass. Turnpike Auth. 341 Mass. 398 (1960)
111.    U.S. v. 564.54 Acres, 441 U.S. 506, 511 (1979)
   **Massachusetts Zoning Cases**
112.    Derby Refining Co. v Chelsea 407 Mass 703 1990
113.    Ka-Hur Ent. v ZBA of Provincetown 424 Mass 404
114.    Pioneer Insulation v. Lynn 331 Mass 560
115.    Revere v Rowe Contracting 362 Mass 884


   **Civil Rights Act 42 USC § 1983-1985**
      **Purposes**
1.  Monroe v. Pape *365 US 173* (1961) (purposes; state remedies not prerequisite)
2.  Mitchum v. Foster, 407 U.S. 225, 242 (1972)
      **Liability**
10. Parratt v. Taylor, 451 U.S. 527 (1981)
11. Monell v. Department of Social Services of New York, 436 U.S. 658, 690-691 (1978)
12. City of Canton v. Harris, 489 U.S. 378 (1989); Gold v. City of Miami, 1998 WL 54803 (11th
    Cir. 1998); Sewell v. Lake Hamilton, 117 F.3d 488 (11th. Cir. 1997)
13. Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); Bryan County v. Brown, 520 U.S. 397
    (1997)
14. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)
15. Patsy v. Florida Board of Regents, 457 U.S. 496, 501 (1982)
16. Zinermon v. Burch, 494 U.S. 113, 124, 132 (1990)
    (concurrent state remedies not a bar)
      **Capacities of Defendants and Remedies Against Defendants**
20. Hafer v. Melo, 502 U.S. 25, 31 (1991); Kentucky v. Graham, 473 U.S. 159 (1985)
21. City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985)
22. Kentucky v. Graham, 473 U.S. 159, 165 (1985)
23. Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989)
24. Ex Parte Young, 209 U.S. 123 (1908)
25. Carey v. Piphus, 435 U.S. 247, 266-267 (1978) (no limit on damages)
26. Farrar v. Hobby, 506 U.S. 103, 112 (1992) (no limit on damages)
27. City of Newport v. Fact Concerts, 453 U.S. 247 (1981) (punitive damages)

28. Smith v. Wade, 461 U.S. 30 (1983) (punitive damages)
29. Florida City Police Department v. Corcoran, 661 So. 2d 409 (Fla. 3d DCA 1995)
   **Denial of Equal Protection of Law**
30. Yick Wo v. Hopkins 118 US 356 (1886)
31. Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073 (2000)
   **Denial of Liberty and Property Without Due Process of Law**
40. Board of Regents v. Roth, 408 U.S. 576
41. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985); Baker v. McCollan, 443 U.S. 137, 145 (1979)
42. Hudson v. Palmer, 468 U.S. 517, 533 (1984)
   **Immunity**
50. Board of Regents v. Roth, 408 U.S. 576
51. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985); Baker v. Forrester, 484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d 555
52. Supreme Court Of Virginia et al., Appellants, v. Consumers Union Of The United States, Inc., et al. 446 U.S. 719 (100 S.Ct. 1967) 1980
53. Orville E. Dennis v. Sidney Sparks, et al 449 U.S. 24 (101 S.Ct. 183) (1980)
**Other Authorities**
60. *Constitutional Remedies: A Reference Guide to the United States Constitution*,
   Michael L. Wells, Thomas A. Eaton
61. *The Measure of Just Compensation*, K. Wyman, NYU


**Constitutional Provisions, Statutes, and Ordinances**
   **The Constitution of the United States**
      **Article I § 9** (*ex post facto law*),
      **Amendment V:**
         "No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."
      **Amendment XIV Section 1:**
         "...nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
   **The Constitution of Massachusetts**
**Statutes of the United States**
      **42 USC §§ 1983 to 1988 (Civil Rights Act)**
      **§ 1983** "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress..."
      **§ 1985** "If two or more persons in any State or Territory conspire...for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the

equal protection of the laws; ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages..."

**§ 1986** "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented;"

**Statutes of Massachusetts**

Massachusetts Civil Rights Act G.L. Ch. 12 § 11H et seq.

Massachusetts Declaration of Rights, Art. 1, and Art. 106 of Amendments

G.L. Chapter 12 § 11H,I (Constitutional Rights)

G.L. Chapter 40A (zoning authority; variances) §§ 6, 10, 17 et al

G.L. Ch. 66 (falsification of records) §§ 5A, 6, 16

G.L. Chapter 79 (public taking of private property) §§ 6, 7B, 10, 12, 14, 16, et al

G.L. Chapter 265 (Civil Rights Act) § 37

G.L. Ch. 266 § 76 gross fraud or cheat;

G.L. Ch. 266 § 94 removal of boundary markers

G.L. Ch. 266 § 121A trespass with motor vehicle

G.L. Ch. 266 § 127 Malicious damage to property

G.L. Ch. 268 §§ 6, 6A

**Ordinances of City of Peabody**

Zoning §§1.4, 15.2.1 (variance required), and 15.6.2.B (exemption)

**Fact: The Land, Prior Uses, And Conveyances**

1. A dwelling upon the subject property of Plaintiff was constructed c. 1800 AD, a farm or village dwelling of log frame construction beside Tapley Brook, the first and oldest home of the several surrounding blocks. The nearby structures and lots are derived in title and land area from this property. The adjacent structure at 2 Lynn St. was built c. 1899 and the structure at 6 Lynn St was built of concrete block presumably in the mid 20th century, both one hundred years or more after the structure upon the subject property (Exhibits 6-8). Like all properties similarly situated, including both adjacent properties (Exh. 33-38, 41-44), over two centuries the property had become "nonconforming" with ex post facto City zoning ordinances.

2. The subject property at 4 Lynn St (Map 102 lot 255, Assessor property ID 102-255) and the adjacent property at 2 Lynn St (lot 255B) were a single lot prior to April 24, 1987 when the lots were separated per Subdivision Plan recorded as Plan Book 227 Plan 7 (Exhibit 43 showing Lots A and B) and Plan Book 279 Plan 34 (Exhibit 44, 8/1/1991, showing Lots A, A2, and B) in the Essex South Registry of Deeds (hereinafter "Registry"). Note that the annotation "easement" in the 1987 plan Exhibit 43 was removed from the 1991 plan Exhibit 44 because it does not refer to any recorded easement, and does not conform to Land Court standards for easement statements in plan drawings, nor to standard practice in representing easement area, purpose, and beneficiary. These lot division plans did not create a "subdivision" under the Subdivision Control Act G.L. Ch. 41 §§ 81K et seq, because both lots were located on a public way, and both plans were accordingly designated "Approval Under Subdivision Control Law Not Required" with signatures of the chairman of the Peabody Planning Board. These lots remained under common ownership until the subject property (lots A2 and B as shown on Exhibit 44) was conveyed 1/6/1998 (Registry Book 14540 Page 550).

3. Prior to conveyance to Plaintiff in 2011, the subject property had passed through foreclosure, was vacant for several years as title passed eventually to FHLMC, and orders by defendant city to correct health and safety concerns with the home met with no timely response by prior owners over a long period, which led to a hardened and persistent outrage of city officials against the property itself, the only target of their outrage which they could potentially affect. City officials apparently made informal plans and verbal assurances to neighbors of future use of the land for

their private parking. Plaintiff made efforts over several months to purchase the antique structure for renovation, an activity with which he has considerable experience, as it was secured and did not in fact pose a risk to persons outside (engineering report 7/13/2010 available). Defendant city building official Goggin made emphatic statements to Plaintiff and to the property broker that renovation would not be permitted, and a demolition order was issued by defendant city. The antique structure was demolished 4/9/2011 pursuant to this order.

4. Plaintiff having made prior studies of constitutional law and land use law on behalf of a charity, knew that the destroyed structure could be replaced under any state law and ordinance consistent with Amendment V of the US Constitution, "nor shall private property be taken for public use without just compensation." Having need for a residence near Boston to continue his engineering work despite a medical problem limiting commuting time, Plaintiff acquired the lot 9/8/2011 (Exh. 9) well aware that zoning nonconformities have no effect upon the title right to rebuild a home, and that Massachusetts G.L. Chapter 40A §6 (Zoning Act; Pre-existing Nonconforming Uses) specifically exempts the replacement of nonconforming homes from zoning ordinances where this "does not increase the nonconforming nature of said structure." Due to a 12 month period for rebuilding imposed by defendant city, a buyer needed unique circumstances to use the residential value (knowledge of statutes and constitutional law, need for the dwelling, cash to build it because financing requires permit, and skills in permitting and construction processes). Plaintiff was fortunate in having these circumstances, the seller wished to be rid of the complications, and no buyers other than Plaintiff made offers, so the price was low. But the value to such a buyer was the full value of a residential lot in this location. The subject property was conveyed to Plaintiff by deed of FHLMC 9/8/2011 (Registry Book 30654 Page 595, Exhibit 9). Plaintiff proceeded rightfully with his plan to replace the former dwelling.

5. Plaintiff promptly had a site plan for the demanded variance (from dimensional limits of the more recent city zoning ordinance) drawn by the same surveyor (Christopher Mello) who had made the recorded lot plans, giving Mello a site plan drawn by the Plaintiff to work from, showing the proposed site features, and filed application 9/26/2011 for a building permit to replace the recently demolished home. Mello made his drawing (Exhibit 45) in a manner openly hostile to the client interests, showing none of the proposed site plan features needed for a variance, but instead showing a list of nonconformities with the zoning ordinance, stated (letter available) that his

drawing was suitable for a ZBA variance application, added notation of a non-existent "easement" suggested on his 1987 drawing (Exhibit 43) but removed from his 1991 drawing (Exhibit 44), and did not inform Plaintiff that the drawing was ready until it was needed.

6. Plaintiff proceeded properly to replace the home for use in his retirement, obtaining Conservation Commission approval (Exh. 13). The proposed reconstruction of the former home was designed to be "no more nonconforming" with the zoning ordinance (Exh.8, 47) so as to be exempt from zoning ordinance requirements under M.G.L. Ch. 40A § 6. It was designed to lie entirely within the outline of the former home, and the final design occupied only the back half of the "footprint" of the former home (Outline Plan) with no violation of other zoning requirements. This required the successive design of six different homes for the property to accord with preferences of the building department, zoning board, and conservation commission of defendant city, four of which were complete engineering designs. Plaintiff was also required to spend many months in regulatory compliance efforts, hiring of surveyors and an environmental consultant, and attending many meetings of this board and commission far from the home of the Plaintiff in Maine. All of this investment was made with the assurance of statutes and constitutional rights that permission to replace the home could not be lawfully denied, as "reasonable investment-backed expectation of value." Such expense (¶ 59,60) is part of the improvement value of the property.

7. Plaintiff applied 9/26/2011 for a building permit to replace the demolished home, and received a permit denial letter (Exh. 11) 10/14/2011. Despite the Ch. 40A §6 exemption for replacing the former home, the defendant city zoning ordinance §1.4 and §15.2.1 requires a variance from its Dimensional Controls (Exh. 41) from its Zoning Board of Appeals (ZBA), as noted in the permit denial letter (Exh. 11). The Plaintiff timely applied for the variance demanded (Exh. 10, 14), noting that denial of the principal use of property constitutes constructive taking of private property, requiring just compensation.

8. Many efforts were made by defendant city officials to block the use of the subject property for the benefit of defendant Dipietro, owner of an adjoining property, who has committed trespass, perjury, theft and conspiracy to commit theft, vandalism, and threats of destruction to gain use of the property for his own parking (see facts 15-40). These attempts to deny rights of the Plaintiff greatly increased the expense of regulatory compliance. However, no objection was found which

was not overcome by the investments of the Plaintiff. The plans met regulations, and most neighbors agreed that the new home would improve the neighborhood.

9. Zoning ordinances enacted since 1800 AD restricted land uses for this zone R1A to residential and related uses (Exh. 40), and made the subject and adjacent properties "nonconforming" with its ex post facto dimensional requirements (Exh. 41, 42), but did not preclude continuing residential use of the subject property or the adjacent nonconforming properties (Exh. 30-38b), the right whereof had passed with title to the Plaintiff as to all owners of such properties. Residential use had continued on this parcel for over two centuries (Exh. 30-32b), and on the adjoining parcels, under later zoning ordinances as "nonconforming" properties, until demolition of the former home in 2011, and continues now on both adjoining properties (Exh. 33-38b).

10. As shown in the Dimensional Controls table (Exh. 41), and site plan (Exh. 42), the present minimum yard dimensions leave no buildable area on the subject property (Exh. 11, 14, 41-42).

| Item | Zone R1A minimum | Subject |
|---|---|---|
| Lot Size (sq.ft.) | 15,000 | 1,841 |
| Frontage (ft.) | 125 | 43 |
| Front + Back Yard (ft.) | 55 | 43 to 66 |
| Sum of side yards (ft.) | 30 | 29 to 43 |

11. As shown in the Use Table of the Zoning Ordinance (Exh. 40) for zone R1A, only Residential, Educational, Church, and Agricultural uses are permitted by right. All of these require structures precluded by the dimensional controls (Exh. 41), except Agricultural use which is clearly uneconomic in small isolated lots, and Accessory use (requiring a permitted principal use) for which the value is negative. Therefore the value of the lot required continuation of the residential use, and denial of residential use would take all or nearly all of the value of the lot.

12. Plaintiff promptly applied for the demanded variance, scheduled for hearing at the November 2011 meeting of the Zoning Board of Appeals (hereinafter "ZBA") of defendant city, mentioning the constitutional issues in the application, and wrote a letter to the ZBA (Exhibit 10) to inform them of the constitutional issues and the specific provisions of state law (G.L. Chapter 40A Section 6, 10) and the Peabody Zoning Ordinance (15.6.2.B) which facilitate variances in accordance with the constitutional right. This letter informed the ZBA that denial would constitute a public taking of private property and would require just compensation, which at that

early point would have been somewhat more than the 2011 assessed land value plus initial architecture, engineering and site planning services and expenses.

13. Defendant city Conservation Commission (hereinafter "Commission" or "CC") agent Lucia DelNegro stated to Plaintiff that she knew building official Goggin and the ZBA members, and hoped that "the ZBA will block" replacement of the subject home before the matter came to the Commission for its permission. Defendant city building official Goggin stated to Plaintiff that he knew "several people on the ZBA" and was "sure" that it would block rebuilding there.

**Fact: Denial Of The Principal Use Of Subject Property By Defendant City**

14. At its meeting 7/16/2012, upon motion to approve the application for variance, the ZBA voted with three in favor and two opposed, which under G.L 40A is not sufficient to approve a motion before a ZBA with five members, and thereby denied the variance required by defendant city to replace the home on the subject property, as so stated then by its Chairman. Plaintiff promptly petitioned for compensation by demand following the vote, but the hearing was closed without such action. The notice to Plaintiff of denial of the variance application (Exhibit 14) establishes public taking of the established residential principal use of the subject property by the defendant. The failure of defendant to award damages to Plaintiff concurrent with the act of taking or petition of Plaintiff is in violation of G.L. Chapter 79 §§ 6 and 10, and in violation of his right to just compensation guaranteed by the Massachusetts Constitution and the U.S. Constitution, Amendment V and XIV, and thereby of the Civil Rights Act 42 USC §§1983-1988.

**Fact: Torts Of Defendants Prior To Denial Of The Principal Use of Subject Property**

The following facts describe acts of the defendants and others, which establish the nature of their wrongful intent, as well as other torts in violation of constitutional rights of the Plaintiff.

15. In discussions with Goggin and DelNegro prior to any ZBA meeting, Plaintiff saw that very special consideration was being given for benefit of defendant Dipietro, owner of one adjoining property, sufficient to suggest that city officials felt an overriding special obligation to him on the basis of some private relationship or affiliation. Dipietro did not respond to two letters from Plaintiff proposing discussion of parking and layout issues, but upon being sent notice of the ZBA meeting, he left a message rudely demanding all information, which was sent. He did not respond

to two or three polite messages at the number from which he had called, but instead arranged to influence the ZBA through others.

16. Three theories without legal foundation were found to guide the actions of officials of the defendant city and others relative to this property, and are presented here only as necessary to understand their actions. The first was that, if Plaintiff had obtained even a small lot at a low price because he recognized that it remained a buildable residential lot, despite the declarations of the building official, then somehow the defendant city or others had a right to obtain the property from the Plaintiff at the same price, and if refused (as anyone would refuse in like circumstances), to use extortion, collusion, perjury, and the abuse of public office, to take the property for their own purposes or at least destroy its value to the Plaintiff. The defendant city officials and those whom they sought to benefit clearly shared this theory, and the price Plaintiff had paid was often cited or alluded to between them to recruit others to oppose his interests. But this theory has no basis in law whatsoever, and is in fact no more than a rationale for crime.

17. The second false theory among the city officials, was that if the property or its value were held by a court to have been taken by the city, it would only have to compensate Plaintiff for what he paid, rather than the required fair market value of the residential lot (prior to acts by the city to deny the residential primary use thereof) plus development and litigation costs. To discourage this incorrect reasoning, which was very evident among city officials, Plaintiff advised the ZBA by letter (Exhibit 10) that "just compensation" means fair market value, whereupon the defendant city had its assessor reduce the assessed value *of the land* by 97 percent from $112,200 to $3,200 (Exhibits 30, 31, and 32; see Demand for Relief, Assessed Values Provided by Defendant) without noting the change of ownership or the removal of the prior home, despite noting the more recent sale price to Plaintiff. This selective alteration of the public record of the Assessor of defendant city clearly shows intent to create the illusion of low value to be compensated, an act of perjury and violation of G.L. Chapter 66 (public records) §§ 5A, 6, and 16. In fact, if the assessments of the adjacent two parcels by the defendant city are taken as fair, the 2015 fair market value (see paragraph 53) of *the land only* is $113,412, over 35 times the tampered assessed value, to which must be added the other damages of development time and investment, the "investment backed expectation of value" upon which compensation for public takings is based.

18. The third false theory which guided city officials was the notion that, because Plaintiff obtained the subject property at a low price, private contractors should be encouraged with that information to charge him many times the reasonable and customary fees for their services, and multiple fees for multiple city proceedings should be sought.

19. At the ZBA meeting 11/9/2011, Conservation Commission agent DelNegro attended without request, and just prior to hearing this matter DelNegro spoke with a ZBA member and mentioned the previous list price of the lot as the amount paid by the Plaintiff.

"We'll just take the land then. We'll just take it." stated the ZBA member.
"That's what I was thinking." replied Delnegro.

The ZBA was then told by defendant city officials Goggin and DelNegro, seated among its members and speaking together, that they preferred that the variance be denied, but could not state any cause within the jurisdiction of the ZBA, and DelNegro stated that the CC "has objections" although the Commission had never met on the matter nor heard the Plaintiff, and later acted favorably in the matter. The ZBA chairman noted that such objections were not within the jurisdiction of the ZBA, but these statements were not transcribed into the published minutes of the meeting. The Plaintiff was astounded at such brazen and confident abuse of office.

20. At this meeting the ZBA heard a resident Puleo (who lived more than 300 feet away across the intersection on another street) object on behalf of adjoining property owner defendant DiPietro that he thought the subject property should be used only for parking for DiPietro (regardless of its established residential use predating all other buildings in the area). He claimed that there had been numerous traffic accidents nearby involving children due to cars backing out of driveways, and brought a child intended to dramatize his claim. But the subject property plan was designed with a semicircular driveway specifically to prevent backing out of the driveway (Exhibits 8, 47), unlike most other properties in the area against which the objector had no complaint, including property of defendant Dipietro and properties adjacent to that of Puleo, and its use for parking would increase any vehicle maneuvering hazard. Furthermore, both parcels adjoining the subject property (including that of DiPietro) do require residents to back out onto the street, so the objector knew that he was accusing the innocent on behalf of those causing the problem. Puleo's land use preference was clearly stated as a perjury to benefit DiPietro, and was deliberately misrepresented as a matter of public concern. The ZBA continued the matter to

January to check police accident records, which did not confirm the claim of risky parking at local properties. This meeting established the intent of certain city officials to serve purposes at variance with public duty, and was the first known public effort to influence ZBA members by means of perjury arranged by defendant DiPietro.

21. At the ZBA meeting 1/23/2012 its chairman Panos indicated that the ZBA had "no substantive objections" to the variance. He stated that the ZBA had that day received a letter from defendant city director of Public Services Robert Langley (Exhibit 12) requesting that two traffic signal poles and curb cuts on the adjacent sidewalk be indicated on the site plan drawing, as these essential features had been omitted by surveyor Mello. The hearing was continued to February 2012 to permit the drawing to be revised in consultation with city engineer William Paulitz.

22. Plaintiff also needed a "resource area" drawing for the Conservation Commission (showing any wetland vegetation and the flood zone line). Lines would also be drawn between several resource flags, which Plaintiff would have to have placed at separate expense by a wetland scientist. The surveyor Mello had already made the base drawing, and so would need to make only a few additional measurements, at most one half day, whereas another surveyor would have to re-survey the lot. Mello refused to simply correct his variance site plan drawing as requested by the city engineer, and stated that although he had charged $300 for the survey, he would now charge $2200 to do "another survey" simply to add the omitted traffic poles and curb openings, and show the flag lines. The $2200 charge was to include subdivision "playgrounds and recreation areas" on this small 43x66 ft lot. This quote was double the amount paid by Plaintiff for professional surveys of large land areas in Maine with complex boundaries, roads, streams, ponds, and difficult observation conditions. The Mello quote was plainly extortionate, exploiting his longstanding familiarity with defendant city Conservation agent DelNegro.

23. Plaintiff obtained a verbal quote of $330 for the same drawing by Gregory Hochmuth (Hancock Associates) on 1/25/2012, but after Hochmuth spoke with DelNegro (as Mello had done) the quote was raised to $2000. This was the amount DelNegro believed had been paid for the lot (the advertised price stated by DiPietro). When informed that this was actionable collusion with DelNegro, Hochmuth agreed by email to charge the originally quoted amount, but later refused to perform the service altogether, an act of discrimination. Plaintiff could obtain a fair quote only by preventing contractors from speaking with DelNegro. But most contractors were

larger companies demanding a minimum fee for "subdivision planning", so that these collusions by DelNegro reduced the options to those contractors who did not return calls.

24. Plaintiff sought to contact defendant city engineer Paulitz to determine whether Plaintiff (an engineer familiar with survey issues and having suitable instruments, but not a licensed surveyor) could himself add the two traffic poles and curb openings to the existing drawing to meet the city engineer's request. When an email message at Paulitz' office elicited no response for several days, Plaintiff left him a telephone message. About a week later, with no response, Plaintiff again left him an email message, and still later a more urgent telephone message. During this period Plaintiff prepared a revised drawing based upon the inadequate site plan by Mello, and obtained from the same city engineering department a recent drawing of the area, showing the location of the same two traffic signal poles and curb openings requested by the city engineer (Exhibit 46).

25. As Plaintiff surveyed the subject property, defendant DiPietro aggressively drove upon and parked upon the subject property himself, a behavior which he often repeated to stake an unlawful claim to the subject property. Plaintiff made a friendly introduction and discussed his plans to replace the former home in a manner agreeable to the neighborhood. Dipietro angrily opposed any plan to "build in front of my garage"(located behind and to one side of the subject property, and in no way affected by the rebuilding). Plaintiff suggested a friendly agreement to trade the use of a corner of the subject property (which would make the garage access somewhat easier) for the use of a corner of Diepietro property (which would make driveway access of the subject property somewhat easier). DiPietro angrily refused. After an effort to make friendly discussion of Plaintiff efforts to resolve the crowded parking in the area, Plaintiff suggested that they "be good neighbors" and "cooperate" to resolve the crowded parking situation. DiPietro angrily and "absolutely" refused, and stated that he would oppose all city permitting and plans of the Plaintiff, without any lawful claim at all. He claimed that the subject property should be his, although admitting that he had made no offer to purchase the property during the two years that it had been for sale at a modest price. He had relied upon what he considered to be assurances of building official Goggin that he would have the exclusive use of the property for parking without even purchasing it, and he intended to force that situation by means of crime.

26. During the Plaintiff survey a belligerent, obese tenant residing in the Dipietro building began walking aggressively back and forth across the subject property of Plaintiff. She denounced the

property and neighborhood, was outraged that anyone would consider "taking our parking", and stated to Plaintiff that "We're just going to break all your windows if you build here." Plaintiff quietly went about his survey measurements to the exasperation of the tenant, who went inside to consult others, and within a few minutes had summoned the police to enforce her felonious claim to the subject property! The officer inquired as to the facts and left after several minutes.

27. During the Plaintiff survey another tenant of the DiPietro building advised the Plaintiff that defendant DiPietro is an electrician then being investigated for "jumpering electric meters" to obtain electricity without payment, who would not cooperate in any way. Plaintiff completed his survey work. All of the markers were stolen within days.

28. Plaintiff therefore wrote a letter to the members of the ZBA and the Conservation Commission (exhibit available) advising of the threat by DiPietro of interference with the permitting process, the threat of felony crime by DiPietro and his tenants, and their cause, which was simply that DiPietro had subdivided his duplex-size house into four apartments served by only two parking spaces, contrary to the zoning ordinance (zone R1A requires one parking space per unit plus one more parking space per property), and had decided to steal property of Plaintiff under the pretence that the deficiency was owed to him somehow, rather than his own problem.

29. With no response from the city engineer, Plaintiff again sent Paulitz an email, this time including a revised lot drawing showing the missing features, based upon both the city drawing and more accurate measurements made by Plaintiff, and asking the city engineer whether such a revision would meet his request to the ZBA. Again Paulitz made no response, again Plaintiff left an urgent telephone message, and for the sixth time Paulitz refused to respond. Plaintiff concluded that the matter was insignificant, and submitted the revised drawing to the ZBA.

30. At its meeting 2/27/2012, the ZBA pretended that it could not accept the prior drawing revised as it had requested, a drawing equivalent in these details to the drawing the city engineer already had on file. Despite the presence of the desired features on an existing city engineering drawing made known to Paulitz, despite having an accurately revised drawing, and despite the claim of all ZBA members that they knew the small lot very well already, the ZBA demanded that yet another drawing be made by a surveyor and that the variance application be withdrawn for later resubmission (with further fees) rather than continue the hearing. Plainly the ZBA was in collusion with DiPietro, Mello, Goggin, and DelNegro to unlawfully obstruct the variance.

31. During this period Plaintiff also applied to the Conservation Commission of defendant city, first for a Request for Determination of Applicability ("RDA") of the Massachusetts Wetlands Protection Act 310 CMR ("WPA"). Although city Commission agent DelNegro was notified by the Plaintiff in a letter and in supporting documentation that 310 CMR 10.58 (6) specifically exempts the replacement of structures built prior to the effective date of the Act, the Commission found at its hearing 1/9/2012 that the Act was applicable, requiring the Plaintiff to go through the far more costly Notice of Intent process thereunder ("NOI") for the proposed replacement.

32. Despite the fact that there were no wetland resources on the property (it was almost entirely paved or built up prior to the structure demolition, as shown by Exhibits 7 and 43-49, and DelNegro had laughed at the idea that there might be wetland resources there) or on the narrow adjacent lot between the property and Tapley Brook (also almost entirely paved or built up), despite the fact that DelNegro had required no drawings or NOI process at all for the much more intrusive project of demolition of the prior structure 4/9/2011 by the prior owner on the same site, despite the statement of the Massachusetts DEP Wetlands Program Chief Michael Stroman that DelNegro should be qualified to simply take a look at such a small lot to determine whether there were any wetland resources there worth surveying, and despite an accurate and detailed plan thereof laboriously prepared by the Plaintiff showing elevations and flood plain based upon the city engineering drawing (Exhibit 48), the Commission demanded a resource area staking by a wetland scientist, and a new professional survey. With difficulty the Plaintiff contracted and paid for professional staking and re-survey by a wetland scientist and surveyor. The professional resource area drawing (Exhibit 49) differed very little in layout and elevations from the plan prepared by the Plaintiff (Exhibit 48), and confirmed the complete absence of vegetated wetland on the subject property. At its meeting 5/17/2012 the Conservation Commission finally approved the plan to replace the former dwelling on the subject property (Exhibit 13, Order of Conditions).

33. The Conservation Commission chairman Frank Lee stated during the hearing that he had received communication from the city engineer Paulitz that the plan prepared for the Conservation Commission (Exhibit 49) met the city engineering requirements as well, with no change needed. Together with the prior statement of ZBA Chair Panos that the ZBA had "no substantive objection" to the proposed replacement of the dwelling, apart from the requirement of the city

traffic engineer for the drawing supplied, this establishes conclusively that <u>the defendant city in fact had no substantive objections remaining at this point.</u>

34. However, defendant city building official Goggin declined to accept this drawing (Exhibit 49) as a zoning site plan, so that Plaintiff was forced to contract further to have yet another site plan prepared (Exhibit 8). The ZBA now had three independent drawings with the information requested by the city engineer, who had a fourth such drawing, and its chairman had already stated that it had no other substantive objection to replacement of the home.

35. At its meeting 7/16/2012, the ZBA heard the matter once more, and Plaintiff answered all questions. ZBA Chairman Panos now claimed that the defendant city could, for unstated purposes, challenge the prior subdivision plans (Exhibits 43 and 44, 1987 and 1991) as potentially nonconforming with then-existing zoning dimensional requirements, so that the subject property would be "not a lot at all", although both plans had been prepared by its favorite surveyor. But in fact, these lot division plans did not create a "subdivision" requiring approval under the Subdivision Control Act G.L. Ch. 41 §§ 81K et seq, because both lots were located on a public way, and both plans were accordingly designated "Approval Under Subdivision Control Law Not Required" with signatures of the chairman of the Peabody Planning Board (Exhibits 43, 44). In addition, both plans had been recorded more than twenty years earlier (thereby extinguishing any such claim), the dimensions thereof were no more nonconforming than those of the lot with the same buildings prior to subdivision, and the plan with lot dimensions was furthermore long accepted in the separate records of defendant city tax assessor for both parcels. Furthermore, no such objection to a subdivision plan would operate only upon one of the two properties divided as opposed to the other (of defendant DiPietro), and any such objections would operate as well against prior subdivisions of the combined parcels from prior larger parcels, because all lots in the immediate area are smaller than required under the present zoning ordinance. This false claim was an attempt to scare off the Plaintiff for benefit of defendant DiPietro, and ZBA chairman Panos later admitted that he could not object on that basis.

36. A member of the ZBA asked Plaintiff whether he had known of legal complications involved, prior to purchase of the subject property. Plaintiff responded that he had made a study of constitutional law related to public takings on behalf of a charity some years before, and knew that the principal residential use could be continued under any state law and regulation consistent

with the United States Constitution, and with the constitutions of states with similar provisions such as Massachusetts. Plaintiff briefly discussed the issues of just compensation for public takings, emphasizing fair market value, and the provisions within state laws of exceptions for pre-existing uses, which prevent needless and costly litigation of the constitutionality of statutes.

37. The ZBA then heard interested parties, including defendant Dipietro, who now claimed falsely that the proposed structure (entirely within the footprint of the former home) "blocks half of my driveway" (the driveway is about 8 feet wide at the narrowest point between his structure and his lot boundary, and the former and proposed structure on the subject property are about another 3 feet away, as clearly shown on the ZBA drawings). Dipietro also falsely claimed an easement over the subject property for his benefit, based upon the erroneous lone word "easement" on the 1987 subdivision drawing (Exhibit 43), but not appearing on the 1991 drawing (Exhibit 44), which in fact does not correspond to any recorded easement, does not show a land area, purpose of easement, or beneficiary thereof, and does not show the book and page number of any recorded easement, as required by the Massachusetts Land Court Manual of Instructions for the survey of lands and preparation of plans (2006) Chapter 2.1.5.28 and 29. Of course Dipietro could not produce a written easement upon request at the hearing, and none has been found in searches of the Registry. In fact there is no such easement, and the word "easement" on the 1987 plan more likely indicated an easement over the Dipietro driveway (where the word appears) for the benefit of the subject property. The claims of Dipietro were all false, known by him to be false, and constitute perjury. Furthermore, even had any of DiPietro's statements been true, these would not be objections to reconstruction within the original house footprint.

38. Plaintiff responded accurately to the Dipietro perjuries, illustrating these obvious points with the professional site plan demanded by the ZBA (Exhibit 8), copies of which were before each member, and three members asked questions and were satisfied, but one ZBA member literally wailed her rejection of every statement of Plaintiff and other members' acceptance thereof, and neither asked questions nor made any statement in opposition. When Plaintiff recounted the facts of threats and crimes by defendant DiPietro, the ZBA chairman declared that this was merely "name calling." Plaintiff asked the ZBA whether it had any further questions, and it had none.

39. As noted in fact 14, at its meeting 7/16/2012 the ZBA voted to deny the variance, and upon the immediate petition of Plaintiff at the hearing, the ZBA failed to assess or award damages for

public taking of private property, in violation of G.L.Chapter 79 §§ 6, 7B, and 10, and in violation of his rights guaranteed by the Massachusetts Constitution and the United States Constitution, Amendments V and XIV, and of the Civil Rights Act 42 USC §§ 1983 to 1988.

40. During related state action, Plaintiff built and installed at the subject property a very strong sign prohibiting trespass and parking upon the subject property (photos available). The sign consisted of ¾" plywood 18"x48" bolted with four 3/8" carriage bolts and double nuts to two 4"x6"x8 foot posts mounted in three foot deep holes in the subject property. Within a few days, defendant Dipietro with criminal intent smashed the large strong sign into splinters and pulled it from the ground, and has continued his theft of use of the subject property for parking, in violation of explicit instructions of the Plaintiff and the signs that have been posted there.

**Summary of Fact**

41. These facts establish a pattern of willful abuse of office by officials of defendant city, and both criminal acts and torts by defendant DiPietro. The defendants are *principals* in the first degree by commission, solicitation, protection, and ratification, and are accessories before and after the fact, in these grave crimes, torts, and abuses of office committed by themselves, their officials, and employees, against the Plaintiff, with the intent and effect of seizing the property of the Plaintiff and violating his Constitutional rights.

42. The acts of defendant city were clearly made with knowledge and *intent* to deny the Plaintiff due process of law in the deprivation of his property, and to deny him equal protection of law relative to others similarly situated such as defendant DiPietro (paragraphs 8-9, 13-25, 28-39; exhibits 7-8, 10, 14, 30-38, 40-44); to deny him just compensation for public taking of his private property (paragraphs 3, 7-8, 12-24, 28-32, 35, 38-39; exhibits 11, 14, 30-32), to solicit and ratify the criminal acts and torts of defendant DiPietro and his tenants against the Plaintiff to seize his property for their own use and benefit, and for the benefit of RK Trust, and to injure the Plaintiff financially (paragraphs 8, 13-29, 22-31, 34-38; all exhibits).

43. Defendant Dipietro has acted in collusion with officials of defendant city to deny to the Plaintiff the established residential use of the subject property, and has committed Perjury in statements to the Zoning Board of Appeals of defendant city, that rebuilding of the former home within its former area on property of Plaintiff, would encroach upon his property, and that he had a conflicting easement, both false claims (paragraphs 8, 13-29, 22-31, 34-38).

44. Defendant Dipietro and his tenants at have made threats of vandalism and arson, to smash the windows of, and to burn the home if rebuilt upon property of Plaintiff (paragraphs 25-28).

45. Defendant Dipietro and his tenants have destroyed and removed the large strong "No Parking" sign erected on the subject property, and have unlawfully seized the subject property for parking of vehicles, in violation of notices of the Plaintiff (paragraphs 25-28, 40).

46. The defendants have persisted in unlawful and discriminatory acts with full knowledge of the rights violated and the injury done, by choice among alternatives, and under color of state law.

47. Every such act of the defendants has been without the consent, against the will, and in violation of rights of the plaintiff, has injured him in the use and enjoyment and value of his property and investment in its improvement, and has injured him in his income, ability to pursue his engineering work, and in his future income.

**Petition For Relief**

48. The Plaintiff respectfully petitions this Court for declaratory judgment, and compensation for damages by municipal taking of his property interests and destruction of his substantial effort and investment to develop the subject property, and consequent major damages to his income and future income. See *Memorandum of Law*, Relief, sections Compensation for Damages. An order shall be provided with appropriate detail.

49. Defendant town waives immunity beyond its insurance coverage by not seeking such coverage.

**Declaratory Relief: Statutes Unconstitutional As Applied**

50. The statutes of Massachusetts violated by the defendant city, including M.G.L. Ch. 40A (zoning ordinances) § 6 exemptions) and M.G.L. Ch. 79 (taking of private property) §§ 6, 7B, and 10 (compensation) contain provisions to exempt the rebuilding of pre-existing properties from ex post facto ordinances, and to make compensation for constructive taking of property by municipalities. Despite extensive cogent argument by Plaintiff, all of these provisions were ignored by the courts of Massachusetts in state action, and are therefore unconstitutional as applied. Massachusetts G.L. Ch. 40A and M.G.L. Ch. 79 should therefore be held by this court to be unconstitutional as applied, and the state courts severely reprimanded for ignoring the provisions of these statutes which were clearly intended to permit their constitutional application.

**Just Compensation For Taking Of Private Property**

51. The Plaintiff respectfully petitions this Court for award of compensation for his damages by municipal taking of the principal use and enjoyment of his property and destruction of his substantial effort and investment to develop the subject property, his income and ability to obtain future income, and his labors and costs of prosecution. The loss of value of the subject property consists of land value and the value of improvements to replace the home.

**Loss of Land Value**

52. The loss of *land value* of the subject property is its value prior to all acts by defendant town which reduced its value and made it unmarketable for the principal residential use denied by the defendant (such as the deprecatory statements of the city building official in 2011 to buyers and the property broker that the home would be or was demolished and could not be rebuilt).

54. The city assessor land values of the subject property and the two adjacent properties for the three years 2010, 2011, and 2012 are shown below and interpolated to 2015 (in parentheses).

### City Assessor Land-Only Values of the Subject Property and Adjoining Properties

| Address | 2010 | 2011 | 2012 | 2015 |
|---------|------|------|------|------|
| 2 Lynn St | 104,100 | 119,700 | 119,700 | 124,800 |
| 4 Lynn St | 116,200 | 89,100 (102,672) | 3,200 (102,672) | 3,200 (113,412) |
| 6 Lynn St | 118,000 | 135,700 | 135,700 | 135,500 |

The valuations by the city assessor are introduced as evidence of value and changes of value. Exhibits 30-32b show values of the subject property; Exhibits 33-35b and 36-38b show these values for the adjacent properties. These values are already sworn by the defendant city and certified by the state. Valuations by the defendant city provide a lower limit of value.

54. These values clearly show the effect on the assessed value of declarations by the building official of defendant city that the former home could not be rebuilt upon the subject land. The last assessed value not reflecting this injury is the 2010 land-only value of $116,200.

55. The true Assessor land values of the subject property at 4 Lynn St may be found by interpolating between the two adjoining properties, both in the same residential zone and use. The interpolated values are shown in parentheses in the table above, computed as shown below.

### 2015 Assessed Land Values of the Subject Property and Adjoining Properties

| Address | Area (sq.ft.) | 2015 Assessed Land value | Interpolated Land Value |
|---------|---------------|--------------------------|-------------------------|
| 2 Lynn St | 4439 | 124,800 | 124,800 |
| 4 Lynn St | 1841 | 3,200 | 113,411.80 |
| 6 Lynn St | 6880 | 135,500 | 135,500 |

Both adjoining properties fit the linear rule of $105,341.87 per house lot plus $4.38345 per sq. ft. of lot area, so the 2015 Assessor land value of the subject property between them at 4 Lynn St is

$$\$105,341.87 + \$4.38345 \ (1841 \ sq.ft.) = \underline{\$113,411.80}$$

This value is based directly and solely upon valuations already sworn by the defendant city and certified by the state. If a lower value were asserted on behalf of defendant, this would establish a general falsification of assessed values by defendant city, which must reduce all property values in the city by the same ratio and prove that this is done. No appraisal allowed in evidence may treat

the subject property differently from the adjoining properties, nor consider properties in other zones or uses than the residential use denied by the defendant city. To avoid litigation of city valuations already sworn by the defendant city and approved by the state, the Assessor-based value of $113,411.80) is taken as an extreme low limit of land value of the subject property. However, assessor values seldom reflect Fair Market Value, the criterion of Just Compensation.

55b. Fair Market Value is determined by independent appraisal. Independence requires that the appraiser have no affiliation, residency, or dependency at or near the defendant city. The FMV of the subject land only as determined by the independent appraiser service Zillow was $189,952 in 2014 (see Exhibit 26b). This service posts appraiser values of all properties in the United States on its website Zillow.com. It has not posted appraised values for this property since 2014 due to attempts by agents of the defendants to deprecate the property during this litigation, and due to the fact that the market value has been destroyed by these unlawful acts of the defendants.

55c. The Zillow value of the subject property for a settlement in 6/2016 is therefore scaled from the 2014 value in proportion to the Zillow average home value increases for the city of Peabody from 6/2014 to 6/2016 (an increase of 333,000 to 360,000 or 9.1%) yielding a value of $207,220 for June, 2016. This is the fairest estimate of market value of the subject land only, had it not been subject to theft and destruction by the defendants.

56. The residual value of the land after denial of its residential principal use is extremely low because no structure can be built there under present zoning regulations, so it can only be used as parking, which is permitted only as an "accessory use" incidental to residential use, so that the land would have to be combined with an adjoining lot to be used at all. Therefore it has value only to the criminal neighbor with insufficient parking, who (although he offered $1,000 by telephone), has refused to negotiate so long as he is able to use it without purchase. Even were it sold for $1,000, the cost of sale includes attorney fees, recording costs, and taxes during the sale period, which at the time of Plaintiff's purchase amounted to $1,040, so that there is negative residual value. In fact, capitalization of the continuing taxation by the town would yield a negative net value of several thousand dollars. The denial of residential use therefore precludes a fair market and leaves a negative land value. Plaintiff reserves the decision whether to retain the lot and request compensation for the negative capitalized value of taxation, or to grant it to the defendant upon payment by defendant of just compensation for denial of the principal use.

**Loss of Value of Improvements**

57. The loss of value of improvements here is limited to the improvement value added by Plaintiff, primarily his site planning and engineering services and other expenses to replace the former home, which are now losses caused by denial of residential use by defendant city.

58. Because the United States Constitution Amendments V and XIV guarantee that private property may not be taken for public use without just compensation, Plaintiff expenses to replace the home were reasonably based upon rightful continuation of residential use. The eight months of planning and engineering services are more than usual for home construction, due to wetlands permitting and the prolonged effort to obtain the variance that was denied. These expenses would be part of the improvement cost of the property had construction been permitted by the defendant city, and together with the land value, establish the "investment backed expectation of value" which is the criterion of value upon which compensation is based.

59. Because exact replacement of a home is by right, Plaintiff originally made full building plans to replace the former home in its original size and position, and submitted these to the defendant city building official with the application for building permit. Advised by the building official that something closer to the present setback requirements, and with better parking access, was more likely to meet with ZBA approval, Plaintiff made four further sets of building plans, and submitted one or two of these to the building official as potential alternatives. During proceedings to obtain approval of defendant city Conservation Commission, Plaintiff was required to make further changes to elevate the structure on piers above the 100-year flood plain. A total of six building and site plans, including four complete structural plans, were required to meet requirements of defendant city. Plaintiff estimates that well over 600 hours of engineering and planning effort (four full time months) was required to make these building and site plans.

60. In addition, Plaintiff was required by this elaborate planning process to read, understand, and apply the laws of Massachusetts and the ordinances of defendant city regarding zoning acts, building, and wetlands protection, an effort of several hundred hours. Plaintiff was also required to prepare substantial documents and argument in support of the Conservation RDA and NOI process, as well as to notify and provide documentation to dozens of abuttors, publish notices of four meetings, etc., an effort of several hundred hours. In addition, Plaintiff was required by defendant city to travel round trip between his present residence in Springvale, Maine and

Peabody, Massachusetts seven or eight times to attend meetings, and made four or five additional trips to the project site for planning purposes, a total of about seventy hours. Plaintiff was also forced to travel between Florida (where he was settling the estate of his mother) and Maine about twice as often as he would otherwise have found necessary (three additional trips), so as to attend meetings of the CC and ZBA which were continued or postponed, a total expense of about $1000 per trip and one hundred hours of additional travel time. A total expenditure of 2000 hours and cash outlays of about $8,000 are estimated.

The rate charged for these services by local contractors exceeds the Plaintiff's contract engineering rate, and services of contractors at higher rates were used only where required, so that the Plaintiff's rate for these services represents a minimum cost. Plaintiff demands compensation for his services not less than his normal engineering pay rate of $70 hourly (on a W-2 employment basis through an agency), and for all required services performed by paid contractors, with the related costs of travel and other cash outlays, as well as real estate tax paid at and since purchase. The total compensation for services and expenses of Plaintiff is therefore about $150,000. In addition, Plaintiff must be compensated for any tax upon compensatory damages in excess of his income tax rate.

**Value as average value of two adjacent older homes**

61. Because the Plaintiff has had to spend eight full time months in planning and permitting, and more time in obtaining compensation, he has already invested most of the labor normally required to build a home (which is about one man-year). Because the remaining labor and materials cost is comparable to the renovation cost of an older home, sufficient compensation for loss of this labor and land value would permit purchase of an older home in a similar location relative to Boston. For example, the 2015 Zillow values (land with improvements) of two older homes adjoining the subject property ($298,000 for 6 Lynn St. and $323,000 for 8 Lynn St.) provide a further realistic basis or cross-check for compensation of damages. The average of these values is $310,500, a more accurate estimate of sufficient compensation of the real loss of the Plaintiff caused by defendants.

29

**Value Scaled from Sales of Nearby Homes**

62. The average value of homes sold within 1000 yards of the subject property in the first quarter of 2013 is $318,300. More recent data is lacking. This is scaled by the increase of appraised values for Peabody from that period to June 2016 (20.7%) to determine the average sale price of nearby homes at a settlement date in June 2016, which is $384,158.

**Estimates of Total Property and Investment Loss Due to Public Taking**

63. The following estimates of total property loss of Plaintiff due to public taking are based upon the independent methods detailed above.

| | |
|---|---|
| $310,500 | Value as average of the two adjacent older homes in 2015 (see below) |
| $357,220 | Fair Market Value of land in June 2016 (above) plus Plaintiff expenses (above) |
| <u>$384,158</u> | Value of nearby Comparable Homes sold in 2013 (Exh. 24) scaled to June 2016 |
| **$350,626** | **Average of the above three valuation methods** |

**Consequent Damages: Loss of Employment and Future Income**

64. Plaintiff has lived in southern Maine since 1993 and has commuted to engineering work in the Boston area, the location of nearly all engineering work in his field. Following a deep vein thrombosis in 2009 which limits his commuting time to less than one hour, the Plaintiff cannot commute to engineering work in the Boston area. Engineering employment is usually limited to local applicants, necessitating residence closer to Boston. Without a residence near Boston, therefore, the Plaintiff can no longer obtain engineering work. For this reason Plaintiff sought and found the means to live at the subject property within 30 minutes of most engineering work near Boston, and without this means could not afford a home close enough to pursue his engineering work. Without the residential value of the subject property, the Plaintiff was denied the means to obtain work, and has had no engineering income since 2009. Despite a distinguished engineering career consisting of over thirty major projects from 1978 to 2009, the Plaintiff has been unable to obtain permanent engineering work despite over 2,900 applications since 2009. The value to the Plaintiff of lost income during this period is his engineering rate of $70 hourly as a W-2 employee (plus the tax differential for payment of compensation) from the Fall of 2012 when the home would have been completed at the subject property, to a settlement date in June of 2016, about $525,000 gross income, less any temporary income in this period.

65. In addition, this denial of recent engineering work has probably precluded future permanent engineering work. Employers and agents consistently cite lack of permanent employment in the past three years as the cause for denying the Plaintiff employment. The lack of ability to commute to Boston during this period has therefore ended the engineering career of the Plaintiff several years before retirement, apart from occasional temporary work. The Plaintiff was under the need to work until age 70 due to major financial losses. The future lost income of the Plaintiff due to denial of residential use of his property, is therefore $140,000 annually from a settlement date in June of 2016, until he reaches the age of 70 (Fall of 2022), a total of $735,000.

**Demand of Plaintiff for Compensatory Relief**

66. Paragraph 68 sums the compensatory relief due.

67. The damage award is subject to capital gains tax payable by Plaintiff, which if it exceeds his income tax rate, must be added to the damages so that the net loss to the Plaintiff is compensated.

68. It would be fair to deduct from this late career income the additional compensation to be paid to the Plaintiff for his labor in prosecution of this matter since late 2012, as this represents income for his labor during the same period. If the award is made in June 2016, the total compensation due to the Plaintiff is therefore:

| | |
|---|---|
| $350,626 | Average estimate of Property and Investment Loss Due to Public Taking |
| 70,000 | Costs of prosecution to the present |
| 385,000 | Lost income from home completion in Fall 2012 to June 2016 |
| | ($525,000 less $140,000 services of Plaintiff during this period) |
| **$805,626** | **Loss of the Plaintiff to the present** |
| | |
| 70,000 | Estimated further costs of prosecution |
| $735,000 | Probable resulting lost income from June 2016 to Fall 2022 |
| | (5.25 years at $140,000 less any employment income during this period) |
| $1,610,626 | Net loss of Plaintiff (less employment income to Fall 2022) |

**OATH**

I do solemnly swear that all statements of fact in the foregoing document are true and correct to the best of my knowledge and belief, and that a true copy thereof has been served this day by deposit of certified First Class U.S. mail addressed to each defendant.

Date: _11/6/2015_                         _____

                                               John S. Barth, Plaintiff, pro se

**Certificate**

The above-named John S. Barth appeared before me and stated that the foregoing document is his free act and deed.

Before me

_____

      Notary Public                State of Maine, County of York

RENEE MCDOUGAL
NOTARY PUBLIC
MAINE
MY COMMISSION EXPIRES MAY 25, 2017

32